## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Daniel Lussier,

                 Plaintiff,

       v.

Wal-Mart Stores, Inc., d/b/a
Wal-Mart Supercenter,

              Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 06-1395 ADM/RLE

---

Celeste E. Culberth, Esq., Culberth & Lienemann, LLP, St. Paul, MN, argued on behalf of Plaintiff.

Stephanie D. Sarantopoulos, Esq. and Tyree P. Ayers, Esq., Littler Mendelson, P.C., Minneapolis, MN, argued on behalf of Defendant.

---

## I. INTRODUCTION

On May 30, 2007, oral argument before the undersigned United States District Judge was heard on Defendant Wal-Mart Stores, Inc.'s ("Wal-Mart") Motion for Summary Judgment [Docket No. 19]. In his Complaint [Docket No. 1], Plaintiff Daniel Lussier ("Lussier") asserts claims for aiding and abetting sexual orientation discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.08, subd. 2, and 363A.14, and tortious interference with an employment contract. For the reasons stated herein, Wal-Mart's Motion is granted.

## II. BACKGROUND[1]

On October 6, 2004, Lussier was hired as a job coach for the Bemidji, Minnesota, office of the Occupational Development Center ("ODC"). Lussier Dep. (Culberth Decl. [Docket No.

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

24] Ex. 2; Sarantopoulos Aff. [Docket No. 22] Ex. A) Ex. 2.  ODC is a non-profit organization

that provides vocational rehabilitation services for disabled adults (ODC's "customers").

Molnar Dep. [Culberth Decl. Ex. 3] at 15.  ODC solicits local businesses to employ its

customers.  Id. at 16.  ODC assists its customers with training and job coaching to provide on-

site supervision and support for ODC customers employed by local businesses.  Lussier Dep. at

53.  The ODC job coaches are employees of ODC.  Molnar Dep. at 18-19; Nyland Dep.

[Culberth Decl. Ex. 4] at 36.

During his employment at ODC, Lussier was supervised by Community Employment

Specialist Jerri Nyland ("Nyland").  Nyland Dep. at 17-18, 31.  Nyland was supervised by

Program Coordinator Jeff Molnar ("Molnar"), who had general responsibility for ODC's

Bemidji office.  Molnar Dep. at 15; Nyland Dep. at 25.  As part of Lussier's orientation, Nyland

instructed him regarding ODC's Team Personnel Policies.  Lussier Dep. at 23-24, 33-34, Ex. 5;

Nyland Dep. at 22-29.  ODC's Team Personnel Policies manual provides that employees are

expected to act and dress professionally:

> Each Team Member is expected to perform his/her duties and responsibilities as
> described in the job description, in a manner which is professional, conscientious and
> adheres to basic practices as they relate to the unique personnel requirements of the ODC
> and the position.  Failure to meet these responsibilities may result in disciplinary
> actions. . . .
>
> . . . .
>
> The dress code for the Team Members of this Company shall be in accordance with
> appropriate professional attire.  Attire shall be such that it reflects a positive image of the
> ODC and the business that it conducts.  The determination of appropriate attire shall be at
> the discretion of the Senior Team Member in their respective departments of each
> division.

Lussier Dep. Ex. 5 at 7, 11.

ODC assigned Lussier to supervise a hearing impaired individual employed as a cart attendant at the Wal-Mart Supercenter in Bemidji.  Lussier Dep. at 54, 57-58.  Andrew Abello ("Abello") was then the Store Manager at the Bemidji Supercenter, and Glen Virnig ("Virnig") was an Assistant Manager.  Abello Dep. (Culberth Decl. Ex. 1) at 9; Virnig Dep. (Culberth Decl. Ex. 5) at 8-9.  Abello orally gave ODC permission for its job coaches to work on-site at the Bemidji Wal-Mart.  Abello Dep. at 34-36; Molnar Dep. at 20-23.  Lussier worked 20 hours per week at Wal-Mart, from 11:00 a.m. to 3:00 p.m., Monday to Friday.  Lussier Dep. at 57.  Lussier mainly worked in the parking lot, the entryway, and the front area of the Supercenter.  Id. at 43.

On Thursday, December 23, 2004, Lussier worked his regular shift at Wal-Mart.  Id. at 60.  Wal-Mart was very busy with the approach of Christmas.  Id. at 61-62.  Lussier and the cart attendant struggled to keep up, since the "[t]he carts couldn't come into the store fast enough, just chaos everywhere."  Id. at 62.  Shortly before 2:00 p.m., Lussier became warm and removed his jacket, which exposed his black t-shirt.  Id.  Lussier wore a long-sleeve thermal shirt underneath his t-shirt.  Id. at 61.  The front of Lussier's t-shirt bore the statement, "Sorry I Don't Do Girls, Don't Panic," in white letters.  Id. at 61-62, Ex. 6.  Lussier wore the shirt to openly proclaim that he is homosexual.  Id. at 70.

Around 2:00 p.m., Abello was advised that a Wal-Mart customer had complained that Lussier's t-shirt was offensive because of its sexual nature.  Abello Dep. at 53-55, 66.  Abello asked Virnig to address the issue with Lussier.  Id. at 53; Virnig Dep. at 33.  Virnig approached Lussier, informed him of the customer complaint, and asked him to cover, remove, or reverse his t-shirt because it was against Wal-Mart's dress policy.  Lussier Dep. at 62-63, 88; Virnig Dep. at 33.  Lussier refused, stating that he did not work for Wal-Mart and that he had a right to free

speech.  Lussier Dep. at 63, 88-89.  Virnig warned Lussier that if he did not comply, Virnig

would notify Abello.  Id. at 63.  Lussier replied, "[g]o ahead, I'll talk to him."  Id.  Shortly after

Virnig left, Lussier covered his shirt.  Lussier Dep. at 63.

Upon learning from Virnig that Lussier refused to cover his shirt, Abello "told [Virnig] to

leave it alone.  He's not one of our employees.  We'll let [ODC] deal with their employees."

Abello Dep. at 60.  Abello called ODC and asked either Molnar or Nyland[2] to address the

situation.  Id. at 60-61.  Abello stated that due to Lussier's stated refusal to cooperate, he did not

want Lussier to work as an ODC job coach at the Wal-Mart.  Lussier Dep. at 89; Nyland Dep. at

76.  In response, Molnar drove to the Wal-Mart at approximately 2:30 p.m. and asked Lussier to

return to ODC's office so they could discuss the situation.  Lussier Dep. at 64; Molnar Dep. at

55.  Molnar finished the remainder of Lussier's job coaching shift at the Bemidji Wal-Mart.

Molnar Dep. at 54-55.  Molnar briefly spoke with Abello, and Molnar later observed Abello "felt

bad about the situation and . . . he was in a cooperative type of state I think to try to work this

problem out."  Id. at 60.

Later that day, Lussier met with Molnar and Nyland at ODC's office to discuss the events

at Wal-Mart.  Lussier Dep. at 84; Nyland Dep. at 42.  Nyland, with Molnar's assistance,

prepared an Employee Warning Notice describing the incident:

> Andy Abello, Wal-Mart's General Manager, called and stated that [Glen] had asked
> Daniel to turn his shirt inside out because it was against Wal-Mart's dress policy.  He
> said that Daniel refused and said that he did not work for him so he wasn't doing it.
> Andy stated that he did not want Daniel returning to Wal-Mart in any capacity as an
> employee of ODC.  After Jeff went to relieve Daniel I [Nyland] received a call from
> another [ODC] employee stating that Daniel was standing in the entryway bragging about

---

[2] Abello and Nyland testified that Abello spoke with Molnar.  Abello Dep. at 60; Nyland Dep. at
76.  Molnar testified that Abello spoke with Nyland.  Molnar Dep. at 50-51.

the incident.  He stated that he wanted a fight because it was freedom of speech.

Lussier Dep. Ex. 7.  The warning notice stated Lussier violated ODC's policies for "rudeness to

employees/customers" and "violation of company policies or procedures" regarding ODC's

dress code.  Id.  Lussier signed the warning notice but marked that he disagreed with ODC's

statement of the incident.  Id.  Molnar and Nyland instructed Lussier to return to the office on

December 28, 2004, to further discuss the situation.  Id. at 85, Ex. 7.

On December 28, 2004, Molnar and Nyland met to discuss Lussier's continued

employment with ODC.  Nyland Dep. at 80.  Nyland modified Lussier's Employee Warning

Notice to reflect that Lussier must apologize to ODC and Wal-Mart or he would be terminated.

Id.  Why Molnar and Nyland added the condition that Lussier must apologize to Wal-Mart is

uncertain.  Nyland avers Molnar "said . . . he had talked to Wal-Mart and that if . . . Daniel

apologized he could return."  Id. at 77.  Nyland further avers Molnar did not specify whether

Wal-Mart required an apology.  Id. at 78-80.  Molnar, however, recalled that Nyland and Nancy

Cota in ODC's human resources department added the condition that Lussier apologize to Wal-

Mart.  Molnar Dep. at 78.  Molnar avers he was hopeful but uncertain as to whether Wal-Mart

would allow Lussier to return to its premises as an ODC job coach.[3]  Molnar Dep. at 79, 81.

Regardless, later that day Molnar and Nyland informed Lussier that he would need to

apologize to ODC and Wal-Mart or he would be terminated.  Lussier Dep. at 94, Ex. 7.  Lussier

agreed to apologize to ODC.  Id. Ex. 7.  However, Lussier would not apologize to Wal-Mart

---

[3] Abello's testimony is consistent with Nyland's account.  Abello avers he told Molnar that Wal-Mart did not require an apology, and that Lussier could return to Wal-Mart's premises as an ODC job coach if he did not wear anything that could be viewed as offensive.  Abello Dep. at 72.

because he believed Wal-Mart discriminated against him "for being gay, being out, being proud

about it." Id. at 100.  Lussier stated in the Employee Warning Notice, "I can't say I'm sorry to

Wal-Mart, I will not apologize for their lies." Id. Ex. 7.  Lussier did not explain how Wal-Mart

had lied.  Molnar Dep. at 67-69; Nyland Dep. at 62.  ODC terminated Lussier for his refusal to

apologize to Wal-Mart.[4]  Lussier Dep. Ex. 7.

### III. DISCUSSION

**A.    Summary Judgment Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere

allegations or denials, but must demonstrate on the record the existence of specific facts which

create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

---

[4] At his deposition, Lussier claimed that Wal-Mart lied about his refusal to cover his shirt,
"because if they would have waited five minutes, they would have saw my jacket was on."
Lussier Dep. at 96.  Lussier also explained he believed Wal-Mart inaccurately portrayed his
conduct during the t-shirt incident as rude.  Id.

B.      **Tortious Interference with an Employment Contract**

Minnesota courts recognize a cause of action for tortious interference with an at-will employment contract.  Nordling v. N. States Power Co., 478 N.W.2d 498, 505 (Minn. 1991).  To prevail on his tortious interference claim, Lussier must show: (1) the existence of a contract between ODC and himself, (2) the alleged wrongdoer's knowledge of the contract, (3) intentional procurement of its breach, (4) without justification, and (5) damages.  Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994).  Wal-Mart does not dispute that the first, second, and fifth elements are satisfied.  Therefore, the question is whether there is sufficient evidence that Wal-Mart was a procuring cause of ODC's termination of Lussier and, if so, whether Wal-Mart's actions were justified.

It is undisputed that Abello of Wal-Mart reported the t-shirt incident to ODC and told ODC that he did not want Lussier to return to the Supercenter as an ODC employee.  Abello's report triggered the sequence of events that led to Lussier's termination.  It is unnecessary to decide whether this evidence establishes intentional procurement because the record conclusively shows that Wal-Mart's conduct was justified.

"Justification or privilege is a defense to an action for tortious interference."  Nordling, 478 N.W.2d at 506.  "Justification is lost, however, if a bad motive is present."  Metge v. Cent. Neighborhood Improvement Ass'n, 649 N.W.2d 488, 500 (Minn. Ct. App. 2002).  Whether interference is justified is ordinarily an issue of fact and the test is reasonable conduct under the circumstances.  Kjesbo, 517 N.W.2d at 588.

Lussier argues Wal-Mart was not justified in asking him to cover his t-shirt because he was not a Wal-Mart employee.  However, Lussier worked on Wal-Mart property in his capacity

as an ODC employee.  During an average week, Lussier coached the Wal-Mart cart attendant from 11:00 a.m. to 3:00 p.m., Monday through Friday.  Lussier Dep. at 58.  Lussier performed his job duties in Wal-Mart's entryway, parking lot, and storefront.  Although he did not wear clothing or a name tag with Wal-Mart identification, Lussier's job duties were entwined with the Wal-Mart cart attendant's job duties.  Wal-Mart customers observing Lussier at the Bemidji Supercenter could reasonably conclude Lussier was performing his work duties at Wal-Mart's behest or with Wal-Mart's permission.  See Abello Dep. at 43-44.  Therefore, the record conclusively shows Wal-Mart was justified in expecting that Lussier would wear appropriate attire when he worked at the Bemidji Supercenter.

Next, Lussier argues Wal-Mart was not justified in asking him to remove his shirt because the slogan "I don't do girls.  Don't panic," is not sexually explicit.  Pl.'s Mem. in Opp'n to Mot. for Summ. J. [Docket No. 23] at 23 n.6.  However, "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."  Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995).  Abello, Molnar, and Nyland all concluded that Lussier's t-shirt was inappropriate workplace attire.  Abello Dep. at 66; Molnar Dep. at 102; Nyland Dep. at 45.  Lussier conceded at his deposition that "to do a girl" has a sexual connotation.  Lussier Dep. at 70-71.  Further, Lussier's brief states he "wore a t-shirt about who he would not be interested in sexually."  Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 14.  The record conclusively shows that Lussier's t-shirt was sexually suggestive, and Wal-Mart was justified in asking Lussier to cover his t-shirt.  Abello Dep. at 66.

Lussier argues Wal-Mart's justification is defeated, however, because there is evidence that Abello discriminated against him because he is homosexual.  Lussier first contends that "Abello untruthfully told ODC that [Lussier] refused to cooperate in covering up his shirt." Mem. in Opp'n to Mot. for Summ. J. at 11.  However, it is undisputed that Lussier initially refused Virnig's request to cover his t-shirt.  Although Lussier may have subsequently covered his t-shirt, he did not advise Abello or Virnig of his belated acquiescence.  There is no factual basis to show Abello lied when he told ODC that Lussier had refused to cover his t-shirt.

Lussier also argues Abello untruthfully told ODC that Lussier was rude when he refused Virnig's request that he cover his t-shirt.  This argument also has no basis in the record.  Abello reported to ODC that Lussier refused to cooperate and that Lussier told Virnig he did not work for Wal-Mart.  Molnar and Nyland independently determined that Lussier's refusal to cover his t-shirt and his comments amounted to rudeness.  Molnar Dep. at 69-70; Nyland Dep. at 50-51. Lussier's disagreement with Abello, Molnar, and Nyland's characterization of his conduct fails to demonstrate that Abello was motivated by a discriminatory animus when he characterized Lussier's behavior as rude.

Lussier also claims Abello lied about whether a customer complained about his t-shirt. To support this argument, Lussier relies on a discrepancy in Abello and Virnig's testimony. Abello testified that he was informed of a customer complaint and then he called Virnig on the Bemidji Wal-Mart's internal phone line to tell him to address Lussier's t-shirt.  Abello Dep. at 53-54.  Virnig recalled "somebody coming up to me, saying there was a customer complaint." Virnig Dep. at 36.  Lussier argues this discrepancy is evidence that Abello lied about a customer complaint.  However, both Abello and Virnig recalled learning of a customer complaint; the

minor discrepancy regarding the manner in which Virnig learned of the complaint is not material.

Lussier also relies on his own testimony that some time after he was terminated, Jeannette Parker, then an associate supervisor at the Bemidji Wal-Mart, told him at a bar that she had notified Abello and Virnig about Lussier's t-shirt and she apologized for getting him fired. Lussier Dep. at 102-06. Abello disputes that Parker notified him, and Virnig could not recall her doing so. Abello Dep. at 53-54; Virnig Dep. at 32. Putting aside the considerable evidentiary issues of the admissibility of Parker's statement, it does not alter the undisputed testimony that Abello of Wal-Mart, and Molnar and Nyland of ODC, all determined that Lussier's t-shirt was inappropriate work attire because of the sexual nature of the phrase "I Don't Do Girls."

Finally, Lussier argues he can establish discrimination against him by proof of disparate treatment. Lussier relies on Abello's deposition testimony of a customer complaint about another ODC job coach on-site at Wal-Mart who was kissing and snuggling with his girlfriend. Abello Dep. at 39-41. Abello recalled in that instance he contacted Molnar and that "it wasn't a huge deal because once we addressed it[,] it stopped." Id. at 40-41. Lussier argues that Abello of Wal-Mart did not ask ODC to remove the heterosexual snuggling job coach from the store, whereas he asked ODC to remove Lussier, who is homosexual. However, Lussier has failed to show that he and the heterosexual job coach were similarly situated, since there is no evidence that the snuggling job coach refused a request that he stop kissing and snuggling with his girlfriend. See Johnson v. Univ. of Iowa, 431 F.3d 325, 330 (8th Cir. 2005) (discussing that disparate treatment claim requires showing that individuals were similarly situated). The record conclusively establishes that Wal-Mart's conduct was justified, and Lussier has failed to present

evidence of bad motive.  Therefore, Wal-Mart is granted summary judgment on Lussier's claim of tortious interference with contract.[5]

## C.    MHRA Claims

Under the MHRA, "it is an unfair discriminatory practice for any person intentionally to aid, abet, incite, compel, or coerce" an employer to engage in sexual orientation discrimination, or to intentionally attempt to do so.  Minn. Stat. §§ 363A.08, subd. 2; 363A.14(1), (2).  The definition of "sexual orientation" includes "having or being perceived as having an emotional, physical, or sexual attachment to another person without regard to the sex of that person or having or being perceived as having an orientation for such attachment."  Minn. Stat. § 363A.03, subd. 44.  Lussier claims Wal-Mart intentionally aided and abetted ODC in discriminating against him on the basis of his sexual orientation.  In the alternative, Lussier argues Wal-Mart attempted to incite ODC to discriminate against him on the basis of sexual orientation.

### 1.    Aiding and Abetting Sexual Orientation Discrimination

An underlying discrimination claim is necessary to prevail on a claim of aiding and abetting discrimination.  Smith v. DataCard Corp., 9 F. Supp. 2d 1067, 1081 (D. Minn. 1998). Therefore, to survive summary judgment on his claim that Wal-Mart aided and abetted ODC's sexual orientation discrimination, Lussier must present sufficient evidence that ODC engaged in sexual orientation discrimination.

"At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment

---

[5] Given that Lussier's tortious interference claim fails to survive summary judgment on its merits, Wal-Mart's argument that the MHRA preempts Lussier's tortious interference claim is not addressed here.

action." <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 735 (8th Cir. 2004). A plaintiff may preclude summary judgment in one of two ways. A plaintiff may present "direct evidence" that "show[s] a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the challenged decision. <u>Thomas v. First Nat'l Bank of Wynne</u>, 111 F.3d 64, 66 (8th Cir. 1997) (quotation marks and citation omitted).

Lacking direct evidence of an illegal motive, a plaintiff can avoid summary judgment by creating an inference of unlawful discrimination through the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). First, a plaintiff must establish a prima facie case of discrimination by showing that (1) he was a member of a protected class, (2) he was qualified for his position, and (3) he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. <u>Bergstrom-Ek v. Best Oil Co.</u>, 153 F.3d 851, 857 (8th Cir. 1998). The burden then shifts to the employer to establish a legitimate, nondiscriminatory reason for the alleged discriminatory action. <u>Id.</u> If the employer meets this burden, then the plaintiff must show that the legitimate reason asserted by the employer is merely a pretext for discrimination. <u>Id.</u> at 857-58.

### a.    Direct Evidence of Discrimination by ODC

Lussier argues the <u>McDonnell Douglas</u> analysis is inapplicable because he has sufficient direct evidence of discrimination by ODC. Lussier argues that Molnar selectively enforced ODC's dress code against Lussier because his t-shirt revealed him as a gay man. Lussier emphasizes ODC's dress code does not explicitly prohibit employees from wearing t-shirts with slogans on them. Molnar Dep. at 72-73. However, Lussier's argument does not address that the

-12-

language, "Sorry I Don't Do Girls, Don't Panic," could be construed as sexual in nature. The relevant inquiry for Lussier's disparate treatment argument is not whether ODC permitted employees to wear t-shirts with slogans, but whether ODC allowed heterosexual employees to wear t-shirts with sexual remarks. The record contains no evidence on this issue. Therefore, Lussier has no proof that ODC selectively enforced its dress code against him on the basis of his sexual orientation.

Lussier also relies on evidence of a conversation between Abello and Molnar at the Calvary Church in Bemidji in December 2004. Abello testified that Molnar said he was shocked Lussier was freely expressing he was a homosexual because Molnar thought Lussier, as a former member of the Calvary Church, believed homosexuality was wrong. Abello Dep. at 51-52. Molnar did not recall this conversation. Molnar Dep. at 86. Lussier argues Molnar's alleged comments are strong evidence that Molnar discriminated against him on the basis of his sexual orientation. However, there is no evidence that Molnar's alleged surprise at Lussier's homosexuality influenced his decision-making process regarding Lussier's employment at ODC. The evidence of Molnar's comments is not direct evidence that clearly points to the presence of an illegal motive.

Lastly, Lussier again argues disparate treatment based on the incident of the ODC job coach who kissed and snuggled with his girlfriend while he worked on-site at Wal-Mart. However, as previously discussed, Lussier has not shown that he and the snuggling job coach were similarly situated. Lussier has failed to present direct evidence that ODC discriminated against him on the basis of his sexual orientation. Accordingly, whether Lussier has created an inference of discrimination under the McDonnell Douglas framework is next analyzed.

-13-

      **b.**    **McDonnell Douglas Analysis**

      **i.**    **Prima Facie Case**

The parties do not dispute that Lussier is protected by the MHRA's sexual orientation discrimination provision.  However, Wal-Mart argues Lussier was not qualified for his job coaching position because (1) he failed to comply with ODC's request that he apologize to Wal-Mart for his conduct regarding the t-shirt, (2) he refused to immediately comply with Wal-Mart's request that he cover his t-shirt, (3) Lussier's t-shirt violated ODC's dress code, and (4) Lussier had a previous oral warning in his file for performance issues.  See Lussier Dep. Ex. 7.  Wal-Mart cites the Eighth Circuit's decision in Richmond v. Bd. of Regents of the Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992) for the proposition that an employee's poor performance can demonstrate that an employee is not qualified for his job.

However, the Eighth Circuit has recently clarified that whether an employee performs his duties satisfactorily should not be considered to determine whether the employee was qualified. Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC, 471 F.3d 843, 846 (8th Cir. 2006). Instead, such evidence is appropriately considered at the second and third stages of the McDonnell Douglas analysis.  To establish that he was qualified to job coach, it suffices for Lussier to show that he met the minimum objective qualifications of the job.  Kobrin v. Univ. of Minn., 34 F.3d 698, 702 (8th Cir. 1994).  Before working at ODC, Lussier had previously worked as a job coach, and there is no evidence that he failed to meet the objective qualifications necessary to coach the Wal-Mart cart attendant.  Lussier Dep. at 23-24.  Therefore, Lussier has established that he was qualified for the job coach position.

Lussier must also demonstrate that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. Lussier's termination is an adverse employment action. As evidence of causation, Lussier relies on the same evidence discussed above. Lussier's claims of disparate treatment based on selective enforcement of ODC's dress code and based on the incident of the snuggling job coach fail to provide support for an inference of discrimination for the reasons stated above. Thus, Lussier's only evidence that ODC discriminated against him on the basis of his sexual orientation is Molnar's alleged comments to Abello at the Calvary Church that he was surprised Lussier was homosexual and would openly express it. Given the comments were allegedly made shortly after the t-shirt incident, a close temporal proximity exists between Molnar's alleged comments and Lussier's termination. The Court will assume, without deciding, that Lussier could establish a prima facie case of sexual orientation discrimination by ODC.

### ii.      Legitimate, Non-Discriminatory Reasons and Pretext

ODC disciplined Lussier for violating ODC's dress code and it terminated him for his refusal to apologize to Wal-Mart for his behavior during the t-shirt incident. Lussier does not dispute that ODC has stated legitimate, non-discriminatory reasons for its actions. However, Lussier argues these reasons are pretextual.

Lussier's pretext arguments are without support in the record. For the reasons already stated, Lussier's disparate treatment arguments provide no support for a finding of pretext. The only new argument Lussier raises as evidence of pretext is that because Wal-Mart did not require an apology, it was pretextual for ODC to require Lussier to apologize to Wal-Mart, especially when Lussier had already stated he believed that Wal-Mart had discriminated against him.

Lussier argues Molnar knew that requiring him to apologize to Wal-Mart would be an

"insurmountable" barrier that would give Molnar an excuse to terminate Lussier.  Pl.'s Mem. in

Opp'n to Mot. for Summ. J. at 31.  However, again, this Court will not second-guess ODC's

business judgments.  Hutson, 63 F.3d at 781.  Regardless of whether Wal-Mart required an

apology, Molnar and Nyland were within the bounds of their discretionary business judgment

when they required that Lussier apologize to Wal-Mart.  Lussier can not show that ODC's

reasons were pretextual.  Therefore, Lussier does not have a viable sexual orientation

discrimination claim against ODC.  As a result, Wal-Mart is entitled to summary judgment on

Lussier's claim that Wal-Mart aided and abetted ODC's sexual orientation discrimination.

### 2.    Attempting to Aid and Abet Sexual Orientation Discrimination

Lussier's claim that Wal-Mart attempted to incite ODC to discriminate against him on the

basis of his sexual orientation is almost identical to Lussier's tortious interference claim.  As

with his tortious interference claim, Lussier's claim that Wal-Mart attempted to incite sexual

orientation discrimination can not survive summary judgment.

Lussier again argues that Wal-Mart had no basis to be concerned about his work attire

because he did not wear Wal-Mart identification.  However, for the reasons discussed

previously, Wal-Mart was justified in asking Lussier to cover his t-shirt because it contained a

sexual slogan and he was performing tasks on Wal-Mart property leading to a reasonable

conclusion he was affiliated with Wal-Mart.  Therefore, Wal-Mart's request that Lussier cover

his shirt is not evidence that Wal-Mart intended to cause ODC to engage in sexual orientation

discrimination.

Next, Lussier complains that Abello never spoke directly with him after he refused Virnig's request. However, given Lussier's comments to Virnig that he did not work for Wal-Mart, Abello had no reason to believe that Lussier would listen to him. Therefore, Abello's failure to confront Lussier is not evidence of sexual orientation discrimination.

Lussier also conclusorily asserts that Abello sought to have him removed from Wal-Mart because he wore a t-shirt that revealed his homosexuality. Again, however, Lussier's t-shirt revealed his homosexuality by means of the sexually suggestive slogan "I don't do girls." There is no evidence that Abello allowed heterosexual Wal-Mart employees or ODC job coaches at the Bemidji Supercenter to wear t-shirts with sexually suggestive slogans.

Next, Lussier again argues that Abello lied about a customer complaint. However, Lussier relies exclusively on the hearsay statement of Jeannette Parker. Even assuming arguendo that no customer had complained, Lussier's t-shirt bore a sexually suggestive slogan and there is no evidence that Wal-Mart allowed its heterosexual employees or ODC's heterosexual job coaches to wear sexually suggestive slogans.

Finally, Lussier again argues disparate treatment as compared to the snuggling job coach. However, as discussed above, Lussier has not shown that he and that coach were similarly situated. Lussier has failed to raise a genuine issue of material fact as to whether Wal-Mart intentionally attempted to incite ODC to engage in sexual orientation discrimination.[6] Accordingly, all of Lussier's claims fail and Wal-Mart's Motion for Summary Judgment is granted.

---

[6] The dismissal of Lussier's claim that Wal-Mart attempted to incite ODC to engage in sexual orientation discrimination provides an independent basis for the dismissal of Lussier's aiding and abetting claim.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Wal-Mart Stores, Inc.'s Motion for Summary Judgment [Docket No. 19] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 28, 2007.